## Allison *versus* Commonwealth.

1. Where a juror in a criminal case entertains a fixed and deliberate opinion, no matter how formed, of the prisoner's guilt, he is incompetent ; and his belief that he can try the prisoner impartially will not remove the disqualification. If, however, his opinion be not fixed and deliberate he is competent to serve.

2. A juror in a criminal case being sworn upon his voir dire, replied, in answer to leading questions by the defendant's counsel, that he had formed a deliberate conviction from what he had read as to the prisoner's guilt. He then proceeded to say that it would require evidence to remove that conviction from his mind, and that to this extent, his judgment as a juror would be affected. On cross-examination, however, he testified that he had no other deliberate fixed opinion than that which proceeded from what he had read; that he had nothing more than an impression, which would yield to the evidence in the case, and that he would act impartially and render a verdict according to said evidence. *Held,* that though the examination in chief apparently showed that the juror had formed a fixed opinion, and thus prima facie rendered him incompetent, the cross examination showed that such was not actually the case, and that therefore the juror was competent.

3. Where a juror in a criminal case has formed an opinion from hearing or reading the evidence upon a former trial, he is incompetent even if the opinion thus formed does not come up to the standard of a fixed opinion.

3 Outerbridge.—2

[Allison *v.* Commonwealth.]

4. A mere opinion or impression which is not fixed, and which is not based upon the evidence of a former trial, but upon the evidence taken on some preliminary examination, does not disqualify, provided the juror can act impartially, and render a verdict upon the evidence and upon that alone, uninfluenced by such previously formed opinion or impression.

5. A person mortally wounded was informed by his physicians that there was no hope, and that he must die. He said he knew it, and told all with whom he conversed upon the subject that he would die from his injuries. He then made certain declarations as to his murderer, and immediately after directed his will to be prepared. Upon the will being brought to him he inquired whether if he got well the will would amount to anything. Being told that it would not, he executed it, and afterwards died. *Held*, that his inquiry as to the efficacy of the will in the event of his recovery did not, of itself, in the face of the evidence, disclose any expectation of recovery on his part, and that therefore his declarations as to his murderer were admissible in evidence as dying declarations.

6. The fact that dying declarations have been committed to writing by a bystander, which writing has not been signed by deceased or read over to him, does not exclude parol evidence of such dying declarations.

October 26th and 27th 1881. Before SHARSWOOD, C. J., MERCUR, GORDON, PAXSON, STERRETT and GREEN, JJ. TRUNKEY, J., absent.

ERROR to the Court of Oyer and Terminer of *Indiana county :* Of October and November Term 1881, No. 167.

Indictment of James E. Allison for the murder of his father, Robert Allison. Plea, not guilty.

On the trial, before BLAIR, P. J., the Commonwealth's evidence was to the following effect : Robert Allison, the deceased, was about seventy years of age. Prior to 1877, he lived with his family on his farm in Washington township. His family consisted of his wife, two daughters and three sons. Owing to fights and quarrels with his wife and children, and particularly with his son James, he left his home about January 1st 1877, and went to reside first with his sister and afterwards with his brother Alexander, who occupied an adjoining place to his own. On one occasion, when he returned to his home " to assert his rights there," he was kicked out by his son James, for which assault he had James arrested and indicted. This assault was committed March 13th 1880. The indictment was set for trial on June 17th 1880. By the intervention of some friends, the case was continued when called for trial on that day. There was evidence in connection with said indictment that James made threats that he would shoot his father.

On the evening of Friday, June 18th 1880, Robert Allison was shot near the residence of his brother Alexander. Several witnesses testified that they heard first one shot, and after a few seconds, three others in rapid succession. That after the first

shot, they heard Robert Allison exclaim : "For God's sake, don't kill me, Jim, this time," and after the shooting was over, they heard the expression "You damned old son-of-a-bitch, how do you feel now ?" and recognized James' voice making it. Robert Allison was found to have been shot four times, two at least of the wounds being of a fatal character. He was taken into his brother's house, where he was examined by two physicians the same night. On Friday night and on Saturday, the physicians informed him, that his wounds were fatal, and that they could do nothing for him, and advised him to prepare for eternity, for he had not long to live. He replied that "he knew it, and it was his son, James, that killed him." He repeated this declaration several times, saying further, that he went to the bars to meet Alonzo (one of his sons), and, instead of meeting him, met James, who shot him four times. That at the first shot he fell down and exclaimed : "For God's sake, Jim, don't kill me this time ;" he then got up and started to run, and James caught up with him and shot him three times after that.

About daylight, on Saturday morning, the 19th of June, Thomas Lukehart, a justice of the peace, was called in to write his will. The deceased stated to Lukehart that his son, James, had shot him with a pistol four times, and that he thought he could not live. He then spoke about the will, and he asked Squire Lukehardt "if he got well, if the will would have any effect," to which Lukehardt replied, "it would not," and the will was written.

The counsel for the defendant moved the court to strike out the testimony of Lukehart and others, admitted as dying declarations ; it appearing from the testimony of the witness, Lukehart, that the deceased had at the time hopes of recovering. This motion was overruled "for the present," but being renewed on the following morning, the president-judge addressing the counsel, but in the presence and presumably in the hearing of the jury, granted the motion, and directed the reporter to note that the said testimony was striken out. The court did not, however, at that time, nor subsequently, expressly direct the attention of the jury to the fact that such testimony was stricken out, nor instruct them to disregard it. This omission constituted the seventh, eighth and ninth assignments of error.

It further appeared that one Mr. Hazlett, being present with Robert Allison, at 3.40 A. M. on Sunday, June 20th, wrote down a statement made by him, as his dying declaration, in which he accused his son James of shooting him. This paper was not signed. It was put in evidence by the Commonwealth ; whereupon counsel for the prisoner moved the court to strike out all evidence of so-called dying declarations, "excepting as

[Allison *v.* Commonwealth.]

contained in the written paper, which is the best means of proof, and necessarily excludes all other." Motion overruled; exception. (Tenth assignment of error.)

Robert Allison died Monday morning, June 21st 1880.

The assignments of error mainly relied upon in the argument related to the action of the court in overruling the prisoner's challenges to several jurors, for cause, upon the ground that their examinations upon their voir dire showed that they had formed a more or less fixed opinion of the prisoner's guilt from having read the testimony taken at the coroner's inquest and reduced to writing, the entire substance of which was printed in several newspapers with comments on the tragedy, and which had been read by the jurors so challenged. After the court had overruled the said challenges for cause, the prisoner challenged peremptorily the jurors so objected to, with the exception of one, Joseph Atkinson, who was sworn and acted as a juror.

The several specifications of error relating to this branch of the case recited in full the testimony of the said jurors given upon their preliminary examination, the essential portions of which were as follows:

Frank Fleming, called as a juror, testified:

Q. Have you heard of this case? A. Yes, sir, I have heard of it. Q. Did you read about it in the newspapers? A. Yes, sir, I did. Q. Did you read the testimony that was taken before the coroner? A. Yes, sir. Q. From what you have read and heard of this matter, will you state whether or not you have formed or expressed an opinion about it? A. Yes, sir, I did; I passed my opinion of what I heard and read. Q. State whether or not that is such an opinion as would require testimony to remove it from your mind? A. Yes, sir, it would. Q. In view of what you have read and heard about it, could you go into the jury box and try it without some testimony to remove the opinion you have? A. No, sir.

The prisoner challenged for cause.

By Mr. Thompson.—Q. You say you have formed an opinion from what you have heard and read? A. Yes, sir. Q. That opinion is formed from that alone? A. Yes, sir. Q. If you were sworn as a juror and took your seat in the box as a juror, would you be controlled in your finding by what you heard and read or by the testimony given in the case? A. I suppose by the evidence.

By the Court.—Q. Could you go into the jury box, and after listening to the evidence, render an impartial decision according to the law and the evidence, wholly uninfluenced by any opinion you have formed from what you have heard and read? A. I suppose I could. Q. If you were sworn as a juror,

[Allison *v.* Commonwealth.]

could you give the prisoner a fair and impartial trial according to the law and the evidence, without being influenced by the opinion formed from what you have heard and read ? A. Yes, sir. Q. Would you give the prisoner, when sworn as a juror, a fair and impartial trial, according to the evidence, uninfluenced by any opinion you may have formed from any testimony you may have heard and read ? A. Yes, sir.

By General White.—Q. Have you at this moment, from what you have read and heard about this case, such an opinion as would prevent your rendering such a verdict as the law and evidence given on the trial would warrant ? A. I have, unless it would be removed by evidence given in now.

Challenge for cause overruled, and exception noted for the prisoner.

The prisoner challenged peremptorily.

Jacob Lutz, a juror, upon his examination said :

Examination by Mr. Clark.—Q. Have you heard anything of this case ? A. Yes, sir. Q. Have you formed any opinion ? A. Yes, sir. Q. You have formed an opinion of this case, such an opinion as would influence you as a juror ? A. It would influence without some evidence to change it. Q. That is a fixed opinion, is it ? A. No, sir, not a fixed opinion. Q. How could it be changed ? A. By good evidence. Q. You would be influenced then as a juror somewhat by the opinion you have formed ? You would be influenced to some extent as a juror by the opinion you have formed ? A. Yes, sir. Q. That would affect your judgment to some extent ? A. Yes, sir.

The prisoner challenged for cause.

By Mr. Thompson.—Q. You say you have a fixed opinion ; what do we understand by that ? A. One that would take good evidence to change my opinion. Q. Would you be controlled in your action as a juror by what you have heard, or by what evidence would be produced on the trial ? A. I would go according to the evidence. Q. If the evidence was of a different character from what the report you have heard, the report would have no effect ? A. No, sir. Q. Could you, in making up your verdict, pass fairly upon the evidence ? A. Yes, sir. Q. Could you under the opinion you say you have formed, take your seat as a juror and pass fairly between the Commonwealth and the defendant ? A. Yes, sir. Q. Unprejudiced and uninfluenced by this opinion ? A. Yes, sir.

By General White.—Q. Do you entertain at this time any deliberate fixed opinion ? A. No, sir. Q. As to the guilt or innocence of the defendant ? A. No, sir, not at the present time.

By the Court.—Q. Would the impression or opinion in any

[Allison *v.* Commonwealth.]

degree affect the verdict you would render if you were sworn as a juror? A. No, sir.

Challenge for cause overruled and an exception for the prisoner.

The prisoner challenged peremptorily.

JOHN PHILLIPS, a juror, upon his examination said:

Q. Have you heard of this case? A. Yes, sir; in the papers, the "Indiana Democrat." Q. Testimony was printed in that paper? A. Yes, sir. Q. Will you state whether from what you read and from what you heard you formed in your mind any opinion about the guilt or innocence of the defendant? A. I did form an opinion. Q. Did you form such an opinion as would affect your judgment somewhat as a juror? A. I could not say how that would be until I would hear the testimony; but according to this here testimony I thought he was guilty—them statements that is there. Q. You came to a conclusion on that point? A. Yes, sir, from the testimony that is there. Q. That was your deliberate conviction from what you read? A. Yes, sir, that was from what I read. Q. It would require evidence to remove that conviction from your mind? A. Yes, sir. Q. To that extent your judgment as a juror would be affected? A. Yes, sir, it would.

The prisoner challenged for cause.

By General White.—Q. With the opinion which you gained from reading the newspaper that you spoke of, could you go into the jury box and render a verdict according to the evidence given here, uninfluenced by this previous opinion? A. I suppose I might if the testimony was different. Q. Have you any deliberate, fixed opinion about this case? A. Nothing more than from what I read. Q. Have you anything more than an impression? A. No, sir. Q. You have no such impression as would not yield to the evidence in the case? A. No, sir. Q. Could you then act as an impartial juror between the Commonwealth and the defendant? A. It would be owing to the testimony. Q. Your verdict would be according to the testimony? A. Yes, sir. Q. Could you go into the jury box prepared to hear the case, uninfluenced by this previous impression? A. I consider that I could on account that I never saw this man before. Q. You have no fixed judgment about this case? A. Nothing more than from these accounts in the paper. Q. That would yield to the evidence in the case? A. Of course. Q. Have you any conscientious scruples about capital punishment? A. No, sir.

By the Court.—Q. In answer to the examination of defendant's counsel you spoke of having a conclusion or a conviction, and in answer to the examination by the Commonwealth's coun-

[Allison *v.* Commonwealth.]

sel you spoke of an impression or an opinion; what do you mean by saying that you had a conclusion or conviction in regard to the case; don't want to know what it was, but what do you understand by it? A. From the statement in that paper. Q. Did you come to a conclusion upon the question of the guilt or innocence from the statements? A. I came to a conclusion. Q. That is a fixed opinion? A. I would come to that opinion till it would be removed by other testimony.

By General White.—Q. Have you any fixed conclusion about this case? A. Nothing only from hearsay. Q. Would that hearsay affect you as a juror going in the box? A. I could not say it would. Q. Have you such an opinion or conclusion, as you may call it, that would affect your judgment on the evidence offered in the case? A. I could not say it would. Q. When you say conclusion—now conclusion and opinion is thought by many people to be different things; a conclusion is fixed, and an opinion may be changed? A. I came to the opinion from the statements that was in the paper. Q. You have no conclusion about it? A. No more than that. Q. That is what you mean when you speak of a conclusion? A. Yes, sir. Q. Have you any fixed, deliberate opinion about this case? A. Nothing more than that there. Q. Could you act as an impartial juror between the Commonwealth and the defendant? A. I might on the testimony; it would be owing to the testimony given by the witness, proven. Q. Could any impression that you may have now be removed by the testimony in the case? A. Of course it would have to be removed if it was proved different. Q. Would any opinion that you have now in the case have any effect in your judgment going as a juror on the evidence that would be offered? A. I could not say it would. Q. With the opinion that you have stated, could you take your seat as a juror and render a verdict on the evidence uninfluenced by this opinion? A. I think so. Q. What would control you in your verdict? A. The witnesses. Q. Would your judgment about the witnesses be influenced by this opinion or impression. A. It would not.

By the Court.—Q. Would this impression or conviction, or whatever you may choose to call it, in the slightest degree affect your verdict in this case? A. No, sir, it would not; it would be the evidence I look to. Q. Could you and would you, if sworn as a juror in the case, give the prisoner a fair and impartial trial, being entirely uninfluenced by any previous impression? A. I could not say but what I could; if the testimony would clear him, of course I could, and if not, I could not. Q. I am speaking with reference to your present opinion; could you give him a fair and impartial trial according to the evidence, without being influenced in the slightest degree by the

[Allison *v.* Commonwealth.]

impression that you now have, or have had, heretofore? A. Yes, sir, I could.

The challenge for cause overruled, and exception for the prisoner.

The prisoner challenged peremptorily.

JACOB WILHELM, a juror, upon his examination said:

Q. Have you heard anything of this case? A. Well, I have seen it in the paper, the "Progress." Q. The testimony taken before the coroner was printed there, I suppose? A. Yes, sir. Q. Printed in full? A. Yes, sir. Q. Did you hear of the case besides that publication? A. I did, some little Q. Will you state whether after what you read and heard of the case, you came to a conclusion as to the defendant's guilt or innocence? A. Well, I did not in particular come to any conclusion. Q. Had you formed any opinion n your mind of his guilt or innocence? A. No, sir, I had not. Q. From what you read and what you heard, did you form an opinion in your mind as to the defendant's guilt? A. I thought I did. Q. Did that opinion amount to a conclusion in your mind? A. Well, it did. Q. That was your deliberate judgment of the case from reading and what you heard? A. Yes, sir. Q. This judgment which you have formed would to some extent affect your judgment as a juror? A. Well, I suppose it would. Q. It would require some evidence to remove that opinion? A. Yes, sir.

The prisoner challenged for cause.

By General White.—Q. Have you at this time, at this moment, a fixed, deliberate opinion in your mind about the guilt or innocence of the defendant at the bar? A. I could not fix it. Q. Is that anything more than an impression on your mind? A. That is all. Q. Could you go into the jury box and sit as a juror to hear the evidence in this case and render a verdict unaffected by any prejudice or opinions against the defendant? A. I guess I could. Q. Do you think you could render an impartial verdict between him and the Commonwealth according to the evidence? A. I think I could.

By the Court.—Q. You spoke of having a conclusion or judgment; do you mean that you had such a judgment as a man would form who heard both sides of a case and all the evidence there was in it? A. No, sir. Q. What sort of an impression was it; was it a conclusion or conviction or a mere floating opinion? A. It was a floating opinion. Q. Would that impression or opinion, such as was then made, affect your mind in the slightest degree, favorably or unfavorably to the prisoner, if you were sworn as a juror? A. I think not. Q. Could you divest yourself of any influence or impression heretofore received, and ren

[Allison v. Commonwealth.]

der a fair and impartial verdict in the case according to the evidence? A. Yes, sir.

Challenge for cause overruled.

The prisoner challenged peremptorily.

JOHN PATTERSON, a juror, upon his examination, said:

Q. Have you heard of this case? A. Yes, sir. Q. Did you read of it? A. Yes, sir. In the "Progress." Q. Did you read the testimony taken before the coroner? A. Yes, sir. Q. Finding of the inquest, etc. ? A. Yes, sir. Q. Have you heard it much talked about? A. It was at first talked about in the neighborhood. Q. From what you heard will you state whether or not you have formed any opinion as to the guilt or innocence of the defendant? A. From what I have heard I have formed an opinion. Q. Have you expressed that opinion? A. I don't know that I have; I do not remember ever having, but I may have; I would not say. Q. Did you come to a conclusion, from what you read, as to his guilt? A. Yes, I did. Q. Come to a conclusion in your own mind? A. Yes, I did, from what I read. Q. What you read convinced you of your conclusion that you had come to? A. If the facts that I read be true. Q. Then you had come to a conclusion? A. Yes, sir. Q. Convinced you on the subject? A. Yes. Q. This opinion you would start out with as a juror, would require testimony to remove it, would it? A. It would. Q. You would start out with the conviction that you have formed? A. Yes. Q. You would be somewhat influenced by it until it was removed? A. Yes, I would.

The prisoner challenged for cause.

By Mr. Thompson.—Q. What is the nature of the opinion you have formed; is it a fixed opinion, settled opinion, one way or the other? A. Well, no; if I had evidence that what I have read was not correct I would give way. Q. Is it an opinion or an impression—a floating impression made at the time you read it? A. Well, yes. Q. An impression that if what was true it would be one way or the other? A. Yes, sir. Q. If sworn as a juror could you hear this case uninfluenced by anything you had read or heard, if sworn as a juror? A. I believe I could. Q. Could you pass as a juror between the commonwealth and the prisoner, and give him an impartial trial on the law and evidence? A. Yes, sir, I could.

By the Court.—Q. As a juror, would you be influenced in the slightest degree in coming to a verdict, by any previous impression or opinion? A. No, sir. Q. Could you and would you, if sworn as a juror, give him a fair and impartial trial according to the law and the evidence in the case? A. Yes, sir. Q. Without being in any degree influenced by your previous impression or opinion? A. Yes, sir.

By Mr. Clark.—Q. You would, however, retain the opinion you have until the testimony would satisfy you that it was wrong? A. Yes, sir.

By the Court.—As a juror would you have an opinion without hearing the evidence? A. I would have an opinion of what I have read. Q. As a juror would you have an opinion without hearing any of the evidence? A. No, not any. Q. I understand you that such opinion or impression as you have would in any degree influence your mind as a juror? A. I do not think that it would. Q. What was the character of the opinion; is it a loose opinion or impression, or is it a fixed opinion? A. It was just a loose opinion coming to my mind when I was reading the paper.

The challenge for cause overruled and an exception for the prisoner.

The prisoner challenged peremptorily.

Joseph Atkinson, a juror, upon his examination, said:

Q. Have you heard this matter much talked about in your place there? A. Well, yes. Q. Read something of it in the newspapers? A. Yes, at the time. Q. Where did you read it? A. I believe it was the "Progress." Q. Will you state whether or not, from what you read or heard, you formed an opinion in your mind as to his guilt or innocence? A. Well, I thought by the testimony that I read, that it was rather dark on the prisoner's side. Q. Not what it was, but whether you formed an opinion; did you have an opinion in your mind as to his guilt or innocence? A. I hardly know how to answer that; according to the evidence I read there—— Q. Did you come to a conclusion in your mind, without stating what that conclusion was? A. Well, yes. Q. Will you state whether or not that was a fixed conclusion in your mind at the time, and remained so? A. Well, no. Q. Would it require evidence to remove the opinion which you have on the subject? A. Certainly it would. Q. As a juror you would start out with the opinion you entertain, and, unless the evidence disproved it, you would retain that opinion? A. Yes, sir. Q. To that extent you would be influenced by what you read and heard? A. Well, until further testimony would offset what I read. Q. Did you read the finding of the jurors? A. Yes. Q. Your judgment would be somewhat affected by the opinion you have entertained? A. Until contradictory testimony was offered.

The prisoner challenged for cause.

By General White.—Q. You have no fixed, positive and deliberate judgment about this case? A. No, sir. Q. You could go into that jury box, prepared to hear the evidence, with

[Allison v. Commonwealth.]

all this impression removed from your mind, and do justice to the defendant? A. Yes, sir, I could. Q. If called on to serve as a juror, you could go into the jury box and hear the evidence and make up your mind uninfluenced by any impression you formed when you read this case? A. (Hesitating.) I believe I could. Q. You could render a just and impartial verdict, according to the evidence between the Commonwealth and the prisoner? A. Yes, sir. Q. Would this impression, formed by what you read, in the slightest degree influence your judgment as a juror when you heard the evidence in the case? A. Well, if the same evidence was given here, that was given at the coroner's, I do not know what effect that would have; it would take pretty strong evidence, and I could not say. Q. Throw that out of your view; if it happens to be the same evidence we cannot help that; could you go into that jury box and act as a juror, and hear the evidence in the case, form your judgment on that, uninfluenced by anything you have heard? A. Yes, sir. Q. Then you have no positive, fixed, deliberate opinion about this case at this time? A. No, sir.

By the Court.—Q. Have you any feeling or prejudice against the prisoner? A. No, sir, nothing but sympathy. Q. Is the opinion of which you speak a conditional or absolute one; that is, is it conditional upon the truth of what you have heard and read? A. How is that? Q. Is the opinion that you have formed a conditional or absolute one; that is to say, if the facts be as alleged, or if the evidence be as you have heard or read, then your opinion is so, and so? A. Yes, sir. Q. Is your opinion then a fixed one, or is it a loose and floating opinion? A. Yes, sir, until further evidence. Q. Is it an opinion or judgment of the question of the guilt or innocence, of such character as that it would influence your mind as a juror? A. No, sir. Q. Could you divest your mind of all previous impression or opinion and give the prisoner a fair and impartial trial according to the law and the evidence? A. I believe I could, sir.

Challenge for cause overruled and an exception for the prisoner.

This juror was sworn and sat in the case.

The prisoner's defence rested mainly on the evidence of sixteen witnesses, who testified to his good character as a peaceable, orderly citizen.

The jury found a verdict of guilty of murder in the first degree, and sentence was pronounced by the court. The prisoner took this writ of error, assigning for error, as above set forth, the overruling of his challenges to jurors for cause; the admission of the testimony of witnesses to declarations of the deceased

[*Allison v.* Commonwealth.]

as dying declarations made by the deceased at a time when, as appeared by the evidence of Squire Lukehart, he had some expectation of recovery; and the omission of the court to direct the attention of the jury to the fact that part of such testimony was afterwards stricken out, and should be disregarded; and the refusal of the court to strike out all evidence under the name of dying declarations, except that contained in the written paper.

*Silas M. Clark* and *J. C. Ruffner* (*H. K. Sloan* with them), for the plaintiff in error.—Our challenges for cause were improperly overruled. A juror, who has simply read newspaper statements, or heard unofficial rumors, from which he has formed only an impression, which he swears will not affect his impartiality, is competent. But if he has formed a decided opinion from authentic sources, such as having been a grand juror or having read the testimony taken before the coroner's jury, or upon a previous trial, then he is not competent, even though he says he thinks he can give an impartial verdict on the evidence. The law on this point, as settled by recent authorities in Pennsylvania, may be summarized as follows:

1. If the proposed juror has a *fixed* opinion, derived from *any* source, he is incompetent.

2. If he has a mere opinion, derived from unauthentic sources, which, he says, will not affect his judgment, he is competent.

3. If he has derived from authentic sources a strong opinion, based on the same, or similar, testimony as will be given on the trial, he is not competent.

4. After a juror has testified fully to facts, which disqualify him under the above definition, he cannot, under a leading examination of counsel, swear himself competent again: Staup *v.* Commonwealth, 24 P. F. Smith 458; O'Mara and Irwin *v.* Commonwealth, 20 P. F. Smith 424; Ortwein *v.* Commonwealth, 26 P. F. Smith, 415; Curley *v.* Commonwealth, 3 Norris 151.

In this case the objectionable jurors had formed strong opinions, based on reading the full reports of testimony taken at the coroner's inquest, which was, in all material respects, substantially the same as that produced on the trial.

The juror, Joseph Atkinson (who was sworn and sat in the case), testified: " I thought by the testimony that I read that it was rather dark on the prisoner's side. Q. Did you come to a conclusion in your mind without stating what that conclusion was? A. Well, yes. Q. Would it require evidence to remove the opinion which you have on the subject? A. Certainly it would. Q. As a juror you would start out with the opinion that you entertained, and unless the evidence disproved it you

would retain that opinion? A. Yes, sir. Q. Your judgment will be somewhat affected by the opinion that you have entertained? A. Until contradictory testimony was offered. Q. Would this impression in the slightest degree influence your judgment as a juror when you heard the evidence in the case? A. Well, if the same evidence was given here that was given at the coroner's I do not know what effect that would have; it would take pretty strong evidence, and I could not say. Q. Is your opinion a fixed one, or is it a loose and floating opinion? A. Yes, sir [fixed], until further evidence. Q. Could you divest your mind of all previous impression or opinion and give the prisoner a fair and impartial trial according to the law and the evidence? A. I believe I could, sir." Challenge for cause overruled.

We submit that no man who has formed such an opinion as is here indicated, based upon sworn testimony taken in a legal proceeding before a judicial officer, is competent, psychologically, to say that he can divest himself at will of its influence, so that he can enter upon the investigation of the prisoner's guilt or innocence, and form a new and impartial judgment, unaffected by his previous state of mind, and based solely upon the evidence to be given on the trial. In Ortwein's case, AGNEW, C. J., speaking of the weight to be attached to coroner's inquests, as affecting a public opinion, in which a juror probably participates, remarks: "We know the looseness with which these investigations are generally conducted, especially since the law permitting them to be had before justices of the peace in lieu of the coroner." But this remark does not apply to this case, where the inquest was held by the coroner in person and the jury was composed of prominent citizens.

[SHARSWOOD, C. J. Were the prisoner's peremptory challenges exhausted when the court overruled his challenge for cause to the juror Atkinson?]

No, but we could not afford to exhaust our peremptory challenges at that stage of the case, in cases where we had a right to challenge for cause. If we had such right, the court was bound to grant it, and refusal was error. A prisoner's right to twenty peremptory challenges cannot be so abridged.

The assignments of error relating to evidence of dying declarations should be sustained: Kilpatrick v. Commonwealth, 7 Casey 215; Kehoe v. Commonwealth, 4 Norris 127; Del. & Hudson Canal Co. v. Barnes, 7 Casey 193; Albert v. Miller, 7 W. N. C. 477; Railroad Co. v. Decker, 1 Norris 119; Zell v. Commonwealth, 13 Norris 258; Rex v. Reason and Tranter, 1 Strange 499; Meyers v. Commonwealth, 2 Norris 131 and 132.

[Allison *v.* Commonwealth.]

*Harry White* (with him *M. C. Watson,* district-attorney, and *Joseph M. Thompson*), for the defendant in error.—The testimony of each juror who was objected to, considered in its entirety, will show that the overruling of the prisoner's challenges for cause fell within the principles established in Ortwein's case and the other decisions of this court, cited by plaintiff in error. Moreover the prisoner cannot complain of being forced to peremptory challenges, if his peremptory challenges were unexhausted when the panel was filled. Krebs *v.* State, 8 Tex. App. 1. The record shows but eighteen peremptory challenges altogether.

It being clear from the testimony that the deceased at the time of making his dying declarations was convinced that death was imminent, the mere inquiring about the effect of the will "if he should get well," does not render the declarations inadmissible : Rex *v.* Bonner, 6 C. & P. 386 ; 1 East, P. C. 385 ; Kilpatrick *v.* Commonwealth, 7 Casey 215 ; R. *v.* Bernadotti, 11 Cox C. C. 316 ; R. *v.* Craven, Lewis's C. C. 77, 78.

"If a dying declaration was reduced to writing when made, it is not competent for the prosecution to prove it by parol without accounting for the production of the writing ; but if the deceased made the declaration on several occasions, the fact that it was reduced to writing on one occasion; does not preclude parol evidence of the unwritten declaration on the other occasions :" Krebs *v.* State, 8 Texas App. 1 ; Woodcock's Case, 2 Leach 566 ; Rex *v.* Tranter, 1 Strange 500 ; State *v.* Sullivan, 51 Iowa 142 ; Wharton's Criminal Evidence, 295.

Mr. Justice PAXSON delivered the opinion of the court, November 14th 1881.

The first six assignments allege that the court below erred in overruling the prisoner's challenges for cause to the jurors who are respectively named in said assignments.

As all of these challenges rest upon the same principle, it will be sufficient to discuss one of them. I have selected that of the juror John Phillips, which is believed to embody all of the objections made to either of the others.

The juror had stated on his voir dire that he had formed an opinion ; that he believed the prisoner guilty. The prisoner's counsel then asked him this question : "That was your deliberate conviction from what you read ?" Answer. Yes, sir, that was from what I read." The juror then proceeded to say that it would require evidence to remove that conviction from his mind, and that to this extent his judgment as a juror would be affected.

Prima facie this would disqualify the juror. A "de-

[Allison v. Commonwealth.]

liberate conviction" is the equivalent of a "fixed opinion," which, according to the modern authorities, is the test: Staup v. Commonwealth, 24 P. F. Smith 458 ; O'Mara v. Commonwealth, 25 Id. 424 ; Ortwein v. Commonwealth, 26 Id. 414. It is to be observed, however, that the foregoing statement of the juror was in response to leading questions. The words were suggested by the prisoner's counsel. It is true he adopted them, but it is only fair to the juror and to the court below to turn to the cross-examination to see what he really meant when he answered the questions referred to in the affirmative. We there find the following : "Q. Have you any deliberate, fixed opinion about this case ? A. Nothing more than from what I read. Q. Have you anything more than an impression ? A. No, sir. Q. You have no such impression as would not yield to the evidence in the case ? A. No, Sir. Q. Could you then act as an impartial juror between the Commonwealth and the defendant ? A. It would be owing to the testimony. Q. Your verdict would be according to the testimony ? A. Yes, sir." It will thus be seen that his cross-examination dispels the idea of his having a fixed deliberate opinion, and explains and qualifies his previous statement. If it had appeared upon his cross-examination that the juror intended upon his examination in chief to say that he had a fixed opinion, he would have been incompetent. He would have put himself outside of the jury-box so far as the trial of this case is concerned. Where it clearly appears that a juror has formed a fixed opinion as to the prisoner's guilt, he should not be permitted to say that he can act impartially. He may honestly think so, but the prisoner should not to be subjected to such a risk. Jurors are but men, and are not perhaps above the average citizen either in intelligence or mental self-control, and may be affected by a previously formed fixed opinion without intending or even knowing it. Besides, few jurors are willing to acknowledge publicly that they cannot act impartially. The law wisely delivers the accused from such a peril.

Of the remaining jurors it is sufficient to say, briefly, that Frank Fleming expressed no fixed opinion ; Jacob Lutz said he had not a fixed opinion ; Jacob Wilhelm said he had formed a conclusion or deliberate judgment, but the words were suggested by a leading question, and he explains, upon cross examination, that it was nothing more than an "impression upon his mind" made by reading the accounts of the transaction in the newspapers ; John Patterson said he had come to a conclusion, but that it was a mere floating impression formed from what he had read ; while Joseph Atkinson, the remaining juror, both upon his examination in chief and cross-examination, denied hav-

[Allison *v.* Commonwealth.]

ing formed a fixed opinion. Each of the jurors stated that the opinion formed was not of such a character as would influence his mind as a juror, and that he could and would give the prisoner an impartial trial. That the impressions formed would require some evidence to remove is not material. Impressions formed upon the mind necessarily remain until something occurs to remove them. This is a law of our nature, and cannot be changed by human agency. As was said in Ortwein *v.* Commonwealth, supra, "That evidence would be required to change their first impressions has but little weight. Such must always be the fact even in case of slight impressions or loose opinions. An impression once formed necessarily exists until something else changes it."

It was urged, however, that inasmuch as the opinions of the jurors were in part formed by reading the testimony taken before the coroner's jury, the case comes within Staup *v.* Commonwealth, supra, where it was held that opinions formed from reading the evidence upon a former trial are more to be regarded than those which are merely based upon rumor, or upon newspaper accounts. But in Ortwein *v.* Commonwealth, a distinction was taken between a previous trial and a hearing before the coroner. A juror, who has attended a previous trial, or who has read the evidence delivered thereat, is in possession of the whole case, both what the Commonwealth alleges and what the prisoner offers by way of defence. An opinion formed from such knowledge excludes the idea of impartiality, and it would be perilous to a prisoner to allow such a juror to be sworn in the case. This is not true, to an equal degree, with preliminary examinations. They are in no sense a trial, but rather an inquiry into probable cause. As a general rule such examinations are conducted in a loose manner, but a small part of the Commonwealth's testimony given, and none on the part of the person accused. It would be going very far to extend the principle of Staup *v.* Commonwealth to any preliminary examination whatever. The judge who tries the cause has no knowledge of such examination, or of what evidence was offered thereat, nor can he know if it will even resemble that which is about to be offered upon the trial. It would be a fruitless proceeding for the court below to go into an examination of the character of the evidence offered before a coroner or committing magistrate, to test the competency of a juror.

The true rule, deducible from the authorities, in regard to the competency of jurors, is as follows:

1. Where the juror entertains a fixed or deliberate opinion, no matter how formed, of the prisoner's guilt, he is incompetent; and his belief that he can try the prisoner impartially will not remove the disqualification.

[Allison *v.* Commonwealth.]

2. Where the juror has formed an opinion from hearing or reading the evidence upon a former trial, he is incompetent, even if the opinion thus formed does not come up to the standard of a fixed opinion.

3. A mere opinion or impression, which is not fixed, and which is not based upon the evidence of a former trial, does not disqualify, provided the juror can act impartially, and render a verdict upon the evidence and upon that alone, uninfluenced by such previously formed opinion or impression.

Close questions in regard to the competency of jurors may be frequently avoided by standing the juror aside. In such cases he is not called again until the panel is exhausted, which, in many instances, does not occur.

The publication of the evidence given at preliminary examinations in important criminal cases often seriously embarrasses the administration of justice. While such publications are eagerly sought for and read, they never benefit the community, and are often productive of much harm in various ways. It is a matter worthy the consideration of the legislative department of the government whether the publication of the evidence in criminal cases should not be altogether prohibited by law.

The seventh assignment is without merit. There was no necessity of striking out the testimony of Thomas Lukehart. There is nothing in the case to show that when Robert Allison made the declaration to the witness he did not expect to die. He was mortally wounded. His physicians had informed him there was no hope, and that he must prepare for death. He said he knew it, and told all with whom he conversed upon the subject that he would die from his injuries. There is nothing to contradict this; and the remark by the deceased to the witness, when his will was being prepared, that if he got well the will would amount nothing, does not of itself, in the face of the evidence, disclose any expectation of his recovery. The remark was perhaps natural, but altogether unimportant. What has been said under this head covers also the eighth and ninth assignments.

The tenth, and last, assignment alleges error in not striking out all the oral evidence of the dying declarations of the deceased, upon the ground that the written paper offered in evidence as dying declarations excluded such oral evidence. We see no error in this. The evidence referred to was properly received, and the paper in question cannot have the effect claimed for it. If objected to it would not have been admissible. It was but a statement of what the deceased said as to the cause of his death, reduced to writing by a person who heard it. The paper was not signed by the deceased, nor does it appear to have been read to him, or that he assented to its

3 OUTERBRIDGE—3

[Rumberger *v.* Golden.]

correctness. It might have been used by the person who wrote it to refresh his memory. Beyond this it had no value.

We find no error in this record.

The judgment is affirmed, and it is ordered that the record be remitted to the court below for the purpose of execution.

MERCUR, Justice, dissents, "as the jurors held opinions so strongly fixed as to disqualify them under Staup *v.* Commonwealth."